## IN THE MATTER OF THURMAN P. THOMAS, GUARDIAN OF MARY AUGUSTA LANCASTER, INCOMPETENT

### No. 100

### (Filed 14 July 1976)

1. **Appeal and Error § 5; Insane Persons § 3— duty of courts to protect those under legal disability**

    Those who by reason of legal disability are unable to preserve for themselves their legal rights are deserving of having those rights assiduously protected by the courts, including courts of last resort.

2. **Clerks of Court § 5; Appeal and Error § 5— protection of infants and incompetents — clerks of court — supervisory powers of Supreme Court**

    The function of protecting infants and incompetents has been entrusted by statute to the clerk of superior court in the first instance, G.S. 33-1 *et seq.;* G.S. 35-2 *et seq.*, and the Supreme Court may exercise ultimate supervisory power over this function. N. C. Const., Art. IV, § 12(1); G.S. 7A-32(b).

3. **Guardian and Ward § 7; Insane Persons § 3— acts on behalf of incompetent — standing — complaints against guardian — sources of information**

    Ordinarily the one who acts on behalf of an incompetent is his guardian, trustee, or guardian *ad litem* and the incompetent, being under a disability, is not accorded "standing"; but where the complaint is that the guardian himself is acting either wickedly, incompetently or in ignorance of the facts, the concept of "standing" must necessarily give way to the primary duty of the court itself as the ultimate guardian to protect the incompetent's interest, and in the performance of this duty the court must receive, and should welcome, any pertinent information or assistance from any source.

4. **Guardian and Ward § 4; Insane Persons § 4— sale of incompetent's property — objections raised by friend of incompetent**

    In a proceeding for sale of lands owned by an incompetent, the clerk of court erred in striking allegations by a friend and former attorney of the incompetent raising issues as to whether a sale of the incompetent's lands was necessary or desirable.

5. **Appeal and Error § 22— refusal of clerk to file case on appeal — certiorari**

    Where it was asserted that a proper case on appeal had been tendered to the clerk of superior court but that the clerk refused to file it, the proper action by the Court of Appeals, if an appeal was required, was not dismissal of the purported appeal, but rather issuance of the writ of certiorari to the end that the trial judge settle the case.

6. **Guardian and Ward § 4; Insane Persons § 4— order for sale of incompetent's lands — entry day after petition filed**

    Entry of an order for the sale of an incompetent's lands one day after the petition was filed indicates a degree of haste not consistent

with that investigation and consideration usual and proper to be had in such proceedings.

**7. Guardian and Ward § 4; Insane Persons § 4— sale of incompetent's lands — statutes**

    A proceeding to sell an incompetent's lands should comply with one or more of the following statutes: G.S. 33-31; G.S. 33-33; G.S. 35-10; G.S. 35-11.

**8. Guardian and Ward § 4— sale of ward's lands — satisfactory proof**

    The "satisfactory proof" required under G.S. 33-31 for sale of a ward's property must be some proof in addition to the guardian's petition and must show the necessity for the proposed sale.

**9. Guardian and Ward § 4; Insane Persons § 4— sale of incompetent's lands — failure to consider objections — confirmation set aside — remand for hearing**

    Confirmation of the sale of an incompetent's lands by the clerk and judge is set aside where the record shows that scant attention was paid to the factual basis for the proposed sale presented in the guardian's petition and that facially valid objections to the sale thereafter raised were never addressed, investigated, or answered. Upon remand the clerk, being scrupulous to observe applicable statutory requirements, shall hear such competent evidence as may be offered on the issues raised, shall make findings based thereon, shall recite the kind of proof he considered in making his findings, and based upon such findings shall determine whether to confirm the sale. The matter shall then come before a superior court judge in order that he may determine whether on the record then before him to confirm the sale.

ON petition for *writ of certiorari* pursuant to North Carolina Constitution, Art. IV § 12(1), and General Statute 7A-32(b).

On May 22, 1973, Mary Lancaster, upon an inquisition of lunacy, was adjudged to be incompetent for want of understanding to manage her own affairs. On June 14, 1973, Thurman P. Thomas was appointed her general guardian. On November 28, 1973, Thomas, as general guardian, filed a petition for public sale of some 285 acres of land owned by the incompetent allegedly consisting of eight contiguous tracts. The petition may be paraphrased as follows:

    (1) The incompetent has been a patient in a rest home since June 7, 1973, and will likely remain there for the rest of her life at a cost of four hundred dollars per month.

    (2) The incompetent's personal property has been exhausted except for $2,852.86.

(3) The incompetent owns two tracts of land; her home place consisting of approximately 82 acres and another 285-acre tract consisting of eight contiguous tracts (described by metes and bounds).

(4) The incompetent executed a promissory note on November 3, 1969, in the principal amount of $6283.94 with interest at six percent, secured by a deed of trust on her 82-acre tract. No payments have been made on this debt.

(5) Due to her incapacity for some years, the lack of maintenance and upkeep on the 285-acre tract has resulted in a deterioration of the farm buildings and tenant dwellings and poor condition of the land.

(6) Her funds will soon be exhausted in her normal upkeep and maintenance and it will be in her best interest to sell the 285-acre tract of land, first to discharge the indebtedness and then the remainder deposited in a savings account to earn interest and be used to maintain the incompetent.

The petition was verified by Thomas and signed by W. M. Jolly, Attorney.

On the next day, November 29, 1973, the Clerk of Superior Court of Franklin County, Ralph S. Knott, entered an order, finding in pertinent part as follows:

"2. That by said petition and other satisfactory proof, it appearing to and being found by the court as follows:

\*    \*    \*

"(c) That since the 7th day of June, 1973, the said incompetent has continually been a patient at [a rest home] and that the cost to said ward is approximately $400.00 per month.

"(d) That the personal property of said incompetent has all been exhausted except for the sum of $2852.86 . . . .

"(e) That it is likely that said ward will remain a patient in [the rest home] . . . for the remainder of her life, and that the costs and expenses of said ward's maintenance in said rest home . . . will very likely exceed the sum of $400.00 per month.

In re Lancaster

"(f) That said ward is the owner of two tracts of farm land . . . . That one of said tracts of land is known as the home place of said ward . . . containing in the aggregate 82 acres, more or less. That according to the records of the . . . Register of Deeds, Mary Augusta Lancaster, executed a note in the principal amount of $6283.94 together with interest thereon at the rate of six per cent . . . from date until paid, interest payable on or before 3 November of each year, with the principal being due on demand, secured by a deed of trust of even date conveying the aforesaid 82 acres of land . . . .

"That . . . Mary Augusta Lancaster owns a tract of land containing in the aggregate 285 acres, more or less, consisting of eight contiguous tracts of land, more specifically described by metes and bounds in the petition and said 285 acre tract of land has an estimated tax valuation of $16,380.00.

"3. That after a careful investigation of the facts and circumstances alleged in the petition, the court finds as a fact that the buildings on the aforesaid 285 acre tract of land are farm buildings and tenant dwellings, and due to the said Mary Augusta Lancaster's incapacity for a number of years, there has been no maintenance or upkeep of said buildings and of the farm lands themselves, but said buildings have deteriorated and are in very poor condition, and said farm lands are also in poor condition for lack of proper upkeep.

"4. That the . . . indebtedness . . . is bearing interest at the rate of six per cent . . . and according to petitioner's information and belief no payments have been made on said interest since the making of said note and deed of trust, and . . . interest is rapidly accumulating and becoming an additional debt of said ward.

"5. That the court finds as a fact that the funds . . . will soon be exhausted in the normal upkeep and maintenance of said ward, and your petitioner [sic] verily believes that it will be to the best interest of said ward and will best subserve her estate, for the 285 acre tract of land to be sold for cash, and the net proceeds of said sale to be first used to discharge the indebtedness on [her] home tract of land . . . and that the remainder of said

proceeds be deposited by your petitioner [sic] in a savings account . . . to pay the charges for [her] maintenance and upkeep at [the rest home] . . . and other necessary expenses of said ward.

"6. That after an investigation of the facts and circumstances, the court further finds as a fact that the interests of the said Mary Augusta Lancaster would be materially promoted by a sale of the said 285 acre tract of land described in the petition and would best subserve her estate and said sale would be most advantageous to the said Mary Augusta Lancaster."

The clerk then ordered that W. M. Jolly be appointed Commissioner to sell the 285-acre tract at public auction for cash.

On December 19, 1973, John F. Matthews, a Franklin County attorney, filed a verified "Application" for appointment of a suitable guardian *ad litem* for the incompetent. His application may be paraphrased as follows:

(1) The petition for sale was inadequate to show that the interest of the incompetent would be materially promoted by the sale and the order of the clerk did not reveal that the facts had been ascertained by satisfactory proof.

(2) The promissee on the $6283.94 note was Macon Thomas Carter, deceased. His heirs have assured Matthews they do not intend to demand payment during the incompetent's lifetime.

(3) It is unreasonable to sell 285 acres of land worth approximately $150,000.00 to pay a $6283.94 debt (with accrued interest of $1689.03) that has not been demanded.

(4) The incompetent's lands have a tobacco allotment of 30,000 pounds which is capable of yielding an income of $5400.00 per year. 70 acres of crop land owned by the incompetent can yield an income of $700.00 a year and her dwelling on the 82-acre home tract can be rented for $720.00 a year. The incompetent receives $1250.00 per year in social security benefits and her gross income will be at least $8070.00 for 1974—more than enough to pay her expenses at the rest home.

(5) Sale of the land before her death will result in considerable tax liability on her capital gains that would otherwise never become due.

(6) The incompetent's general guardian is only interested in receiving commission on the sale for himself and his attorney and omitted from his petition that he had arranged to rent the tobacco allotment on the 82-acre home place.

The clerk, upon Matthews' application, ordered that Ruby Eaves Underwood, sister of the incompetent, be appointed guardian *ad litem*, that she be served with a copy of the petition for sale and allowed ten days to answer, and that the sale be stayed.

In Matthews' "Application" he alleged that he had been "general attorney" for the incompetent and "as her friend and attorney is under a continuing right and duty to protect her interests" and that as a practicing attorney he was under a continuing duty to assist the court in protecting the interests of the incompetent. According to a written instrument which appears in the record, Gary C. Carter and John F. Matthews agreed on December 24, 1973, that in consideration of Matthews' efforts to have a guardian *ad litem* appointed for the incompetent and to prevent the sale of her land Carter would guarantee him a fee of $1000.00 in the event Matthews was not compensated out of the estate of the incompetent for his efforts. Gary Carter is the only son of Macon Thomas Carter, deceased, and apparently the principal beneficiary under a will allegedly executed by the incompetent.

On December 31, 1973, Matthews filed a "Motion for Appointment of Different Guardian" alleging that a previously existing attorney-client relationship between Ruby Underwood and W. M. Jolly and Jolly's present interest in the sale as commissioner would render Ruby Underwood's guardianship *ad litem* suspect. He asked that a different guardian *ad litem* be appointed and listed twenty-two friends and neighbors as possibilities.

On January 10, 1974, Ruby Underwood, guardian *ad litem*, filed a verified answer to the petition for sale, basically admitting and supplementing its allegations with further facts and joining in the petition for the sale. However, she denied the validity of the $6283.94 debt and asked the court to order an

accounting of dealings with the incompetent before the appointment of Thurman Thomas. She also alleged that John Matthews did not represent the incompetent in any capacity and had no interest in the matter.

On January 18, 1974, John Matthews filed a verified "Reply" to the answer of the guardian *ad litem*. He again asserted his role as "friend" of the incompetent under Rule 17(c) of the Rules of Civil Procedure and his role as "friend of the court." He alleged in more detail his figures as to the incompetent's probable annual income ($8108.56 to $8664.61 per year). He suggested that the proposals for reinvestment of the incompetent's money would run afoul of statutes regulating investment of funds by fiduciaries. Although denying that any land should be sold he suggested as an alternative that the land be sold tract by tract rather than all at once. He also claimed possession as attorney for the incompetent of certain papers which may, upon her death, become her will, and asserted that a sale of the 285-acre tract would "defeat the testamentary intentions of Mrs. Lancaster as to the devolution of title to her land." Matthews requested removal of Ruby Underwood as guardian *ad litem*, recognition of himself as friend of the court, suspension of the sale until the validity of the debt could be determined, and an order that the guardian rent the "tobacco poundage, farm land and dwellings on the 285-acre section, and the 10% excess [tobacco poundage?] on the 82-acre home tract."

On July 30, 1974, the guardian *ad litem* requested a hearing on the matters raised by the pleadings.

On October 11, 1974, an order granting permission to the general guardian to borrow $2600.00 was entered by the clerk and approved by Resident Superior Court Judge Hamilton Hobgood.

On October 31, 1974 (after a hearing on October 23, 1974), the clerk, noting that Matthews stated he did not represent Gary C. Carter or any member of the Carter family, but that Gary Carter testified under oath that he had employed John Matthews as his attorney for the purpose of stopping the sale, found:

> (1) That John Matthews had a right under Rule of Civil Procedure 17(b)(3) to file an application for the appointment of a guardian *ad litem*.

In re Lancaster

(2) That except as contained in his motion, John Matthews had offered no sworn testimony or evidence to the court that Ruby Underwood was not a suitable and fit person to serve as guardian *ad litem.*

(3) That (for reasons stated) Ruby Evans Underwood, sister of incompetent, is a fit and suitable person to act as guardian *ad litem.*

(4) John Matthews does not come into court with "clean hands" as a friend of the court but was employed by Gary C. Carter to stop the sale.

The clerk concluded (styled as a finding of fact) "that Mr. John F. Matthews and Gary C. Carter have no legal standing in this proceeding and are not proper parties to said proceeding and that therefore, all pleadings filed subsequent to the application should be stricken by the court." The clerk ordered these pleadings stricken, rescinded his earlier stay order of December 21, 1973, and ordered W. M. Jolly as Commissioner to proceed with the sale according to the original order of November 29, 1973. To this order John Matthews excepted and gave notice of appeal to the Judge of Superior Court. Gary C. Carter filed an affidavit giving reasons why he was "greatly aggrieved" by the order.

On November 21, 1974, a "Statement of Case on Appeal" signed by and apparently prepared on behalf of the clerk, was filed. It recited all previous filings together with an allegation that on November 12, 1974, Gary Carter, through his attorney, B. T. Henderson II, had filed notice of appeal. On November 26, 1974, Matthews filed "Exceptions to Statement of Case on Appeal."

On December 20, 1974, Judge Hobgood entered an order (filed December 31, 1974) which recited that a hearing had been held upon an appeal by Gary Carter and John Matthews from the clerk's October 31, 1974 order. The first fifteen findings of fact were recitations of the procedural history of the case. Judge Hobgood then noted that at the hearing of the appeal Gary Carter and John Matthews gave sworn testimony and arguments of counsel were heard. His order then provided:

"IT APPEARING TO THE COURT and the court finds as a fact that John F. Matthews . . . on his own behalf, filed certain pleadings . . . without receiving permission or leave of the court . . . and that [he] has no interest whatsoever

in the subject matter herein involved and he was and is not a necessary or proper party to this proceeding.

"AND IT FURTHER APPEARING TO THE COURT and the court finds as a fact that Gary Charles Carter contended . . . that he is a prospective heir under the Last Will and Testament of Mary Augusta Lancaster who is still living. That the original will of Mary Augusta Lancaster was not introduced into evidence and even if it had been introduced into evidence, the same would fail to show any present legal interest which the said Gary Charles Carter has in the property of the said Mary Augusta Lancaster, she being still living. AND THE COURT FURTHER FINDS AS A FACT that Gary Charles Carter is neither a necessary or proper party to this proceeding.

"AND BASED UPON THE RECORD AND THE FOREGOING FINDINGS OF FACT the court concludes as a matter of law that neither . . . Gary Charles Carter nor John F. Matthews are necessary or proper parties to this proceeding and their appeal, in the discretion of the court should be dismissed.

"NOW, THEREFORE, IT IS BY THE COURT, ORDERED, ADJUDGED AND DECREED:

"1. That neither Gary Charles Carter nor John F. Matthews are necessary or proper parties to this proceeding.

"2. That the aforesaid appeals by Gary Charles Carter and John F. Matthews from the order issued on 31 October 1974 by [the clerk], in this proceeding, should, in the discretion of the court be and the same are hereby dismissed.

"3. That John F. Matthews and Gary Charles Carter are hereby dismissed as parties to this proceeding.

"4. That this proceeding, regarding matters other than the aforesaid appeals . . . is hereby retained for further order of this court, and the sale of the real estate of Mary Augusta Lancaster previously ordered by the [clerk] is stayed until such time as either said appeals are dismissed or ruled upon by the North Carolina Court of Appeals and certified to this court."

Apparently only Gary Carter gave notice of appeal from this order for Judge Hobgood on motion of the general guardian and the guardian *ad litem* ordered that Carter's appeal be dismissed on the ground of failure to make timely service of case on appeal, N. C. Gen. Stat. 1-287.1 repealed effective July 1, 1975, and on the ground that Carter had "abandoned" his appeal. Carter did not contest this determination. Judge Hobgood set aside the stay of the sale and directed W. M. Jolly as Commissioner to proceed with the sale in accordance with "the aforesaid order heretofore entered by the Clerk" (undoubtedly the original November 29, 1973 order).

On April 14, 1975 (after sale, upset bid, and resale), Mr. Jolly made a report of the resale for $158,601.00. On April 25, 1975, the clerk in a confirmatory decree found that the sales were "in all respects duly and properly made, and that the price of $158,601.00 for the whole of said lands is adequate, just and reasonable and the fair value of said lands." He ordered that the sale be confirmed, that expenses of the sale be paid, and that "an allowance . . . in the sum of $7,930.05 in lieu of commissions" be paid to Mr. Jolly. Judge Hobgood confirmed the clerk's decree on April 25, 1975, after finding that the sale "was proper and necessary and for the best interest of [the] Incompetent, and was in all respects duly and properly made and that the price of $158,601.00 . . . is a fair and adequate price . . . . " The last and highest bidders were Thomas E. Barham and wife, Doris P. Barham, June M. Privette and wife, Mary C. Privette.

No appeal appears in the record from this final order. The following, however, does appear:

"STATEMENT AS TO ADDITIONAL PARTS OF THE RECORD

Simultaneously with the docketing by the appellant of so much of the record proper as the Clerk of Superior Court is willing to certify, the appellant has filed in the Court of Appeals her petition that the Court of Appeals issue proper writs to the Clerk . . . requiring [him] to accept for filing certain parts of the record proper which [he] has heretofore refused to accept, including . . . exceptions and notice of appeal . . . [and] statement of case on appeal, including exceptions and assignments of error . . . . "

In re Lancaster

In an opinion by Morris, J., reported at 28 N.C. App. 295, 220 S.E. 2d 838 (1976) the Court of Appeals dismissed the appeal saying:

"No notice of appeal, exceptions, or assignments of error appear in the record filed in this purported appeal. Mr. Matthews asserts that he, on 1 May 1975, handed to the clerk a notice of appeal but the clerk refused to file it. He then petitioned this Court for a writ of mandamus which was denied on 22 July 1975.

"Mr. Matthews was, by order of court, dismissed as a party to this action. He took no appeal from that order. The court found that he had no standing in this litigation and no interest in the subject matter. From the evidence before us, those facts are abundantly clear.

"The general guardian and the guardian ad litem have moved to dismiss the purported appeal. The motion is well taken."

On February 2, 1976, John Matthews, purporting to act as "attorney of record" for the incompetent, gave "notice of appeal" to this Court and filed a "petition for discretionary review" under General Statute 7A-31. On April 8, 1976, we, treating these filings by Matthews as a petition for certiorari pursuant to the North Carolina Constitution, Art. IV § 12(1), and General Statute 7A-32(b) (provisions for the exercise of our supervisory powers), allowed the same.

On April 21, 1976, the serious illness of John Matthews having been called to our attention, we appointed J. Harold Tharrington "to act as friend of the incompetent, and as such to argue the cause before this Court . . . and to make such further investigation of the matter and addendums to the record as he may deem advisable." In the appendix to Mr. Tharrington's brief appear documents which show that John Matthews had attempted to perfect an appeal from the April 25, 1975 decree of the clerk and confirmation thereof by Judge Hobgood by attempting to file on May 14, 1975, a "Statement of Case on Appeal" with the clerk. The clerk apparently refused to accept or file this document. This "Statement of Case on Appeal" contained:

(1) Recitations concerning the hearing in December, 1974, before Judge Hobgood to the effect that (a) Judge Hobgood announced at the outset of the hearing that he

In re Lancaster

would confine it to a determination of the standing of Carter and Matthews in the proceeding; (b) there was offered into evidence by Carter a carbon copy of a purported last will and testament of the incompetent dated May 19, 1965, together with a codicil dated April 2, 1968, in which she named Macon T. Carter the principal beneficiary of her estate and if he should predecease her then his son, Gary Carter, would become the principal beneficiary; and (c) there was offered into evidence by Matthews a "Protest Against Sale of Land" signed by thirty "friends and neighbors" of the incompetent.

(2) A motion addressed to Judge Hobgood and proposed order declining to confirm the sale of the land. To this motion and order were attached: (a) Matthews' affidavit to the effect that for tax purposes the incompetent had a net basis in the 285-acre tract of $35,411.28 and if sold at $158,601.00 she would owe capital gain taxes in the sum of $38,656.06; and (b) documents from the guardianship file showing that the incompetent's two tracts of land had been rented in 1975 for 20 cents per pound for the tobacco poundage and $10.00 per acre for land other than that on which the tobacco was planted, and the guardian's annual account dated May 28, 1974, giving total receipts of $9,906.74 and total disbursements of $7,380.40.

The "Statement of Case on Appeal" included thirteen exceptions and eight assignments of error to the April 25, 1975 confirmatory decrees.

Special counsel also collected all the accounts made by the guardian from June 14, 1973, the date of his appointment, to April 7, 1976. The account began with $2,431.05 on hand. The following total receipts were collected and disbursements made (shown, unlike the accounts themselves, on an annual basis for ease of comparison):

June 14, 1973 — June 15, 1974
    Receipts:               $ 7,576.29
    Disbursements:       8,070.45

June 15, 1974 — June 15, 1975
    Receipts:               $ 9,518.20
    Disbursements:       11,239.16 (includes repayment of $2600 loan)

June 15, 1975 — April 7, 1976
    Receipts:                        $ 9,932.80
    Disbursements:               9,729.76

Summary for the entire period would show $27,027.29 in total receipts, including $19,131.29 for farm and tobacco rental, and $29,039.37 in total disbursements, leaving a balance on hand of $418.97 as of April 7, 1976. Of the total disbursements $9,091.21 was attributable to legal and administrative fees and $11,209.02 to nursing home expense. An itemized breakdown shows:

*Receipts:*

| | |
|---|---:|
| Social Security | $ 3,766.40 |
| House Rental | 1,528.00 |
| Farm & Tobacco Rental | 19,131.29 |
| Loan Proceeds | 2,600.00 |
| Medicare | 1.60 |
| Total | $27,027.29 |

*Disbursements:*

| | |
|---|---:|
| Wake Forest Rest Home | $11,209.02 |
| Medical | 1,476.03 |
| Utilities | 91.09 |
| Insurance | 1,147.06 |
| Repairs | 1,553.40 |
| County Taxes | 1,590.26 |
| Legal & Administrative | 9,091.21 |
| Loan | 2,757.32 |
| Miscellaneous | 123.98 |
| Total | $29,039.37 |

Special counsel also presented surveys and aerial photographs showing that the 285-acre tract, allegedly contiguous, was in reality *six contiguous* parcels totaling 239 acres and *two separate non-contiguous* parcels of 38 acres and 8 acres, respectively.

*J. Harold Tharrington, Special Counsel for Mrs. Mary Augusta Lancaster, Incompetent.*

*Yarborough, Jolly & Williamson, by E. F. Yarborough, Attorneys for Thurman P. Thomas, Guardian of the Estate of Mrs. Mary Augusta Lancaster, Incompetent.*

---

**In re Lancaster**

---

*Davis, Sturges & Tomlinson by Conrad B. Sturges, Jr., Attorneys for Mrs. Ruby Eaves Underwood, Guardian Ad Litem for Mrs. Mary Augusta Lancaster, Incompetent.*

EXUM, Justice.

This case is a procedural morass. In the calm eye of the procedural hurricane, however, reposes the interest of the Court's ward, Mary Augusta Lancaster, and this Court's inescapable duty to protect it. We have, in order to exercise our supervisory powers, brought this entire matter before us for review. Our decision is to set aside both the clerk's order striking the allegations filed by Mr. Matthews and the confirmatory decrees of the clerk and judge and to remand for further proceedings and findings in accordance with this opinion.

[1]  There is no principle more universally recognized in the law than this: Those who by reason of legal disability are unable to preserve for themselves their legal rights are deserving of having those rights assiduously protected by the courts including courts of last resort. "At common law the king, as parens patriae and fountain of justice, is the general protector of [infants and incompetents]." *Sullivan v. Dunne,* 198 Cal. 183, 244 P. 343, 345 (1926). In Las Siete Partidas, Part III, Title XXIII, Law XX (Spain ca. 1263 A.D., trans. Scott 1931) we read in reference to the appeals of widows and minors:

> "This is the case for the reason that although the King is required to protect all the people of his country he should especially protect such as these, since that they are, as it were, unprotected, and are more destitute of advice than others."

In England this duty of the highest legal authority to protect infants and incompetents was delegated to the Chancellor by the King. 1 W. Blackstone, Commentaries * 463. See e.g., *Duke of Beaufort v. Berty,* 1 Peere Williams 702 (Chancery 1721).

[2]  In this state the function of the Chancellor has been entrusted by statute to the clerk of superior court in the first instance. N. C. Gen. Stats. 33-1 *et seq.,* 35-2 *et seq.; In re Propst,* 144 N.C. 562, 57 S.E. 342 (1907); *Duffy v. Williams,* 133 N.C. 195, 45 S.E. 548 (1903). This Court may exercise ultimate supervisory power over this function. N. C. Const., Art. IV § 12(1); N. C. Gen. Stat. 7A-32(b). "So careful is the law to

guard the rights of infants," *Moore v. Gidney,* 75 N.C. 34 (1876), and incompetents that we have chosen to exercise this supervisory power in this instance.

Ordinarily our legal system operates in an adversary mode. One incident of this mode is that only those who properly appeal from the judgment of the trial divisions can get relief in the appellate divisions. This can be a strict requirement. *Henderson v. Matthews and Rogers and Newkirk and Lanier v. Henderson,* 290 N.C. 87, 224 S.E. 2d 612 (1976). There are, however, exceptions. In *Edwards v. Butler,* 244 N.C. 205, 92 S.E. 2d 922 (1956) this Court exercised its supervisory powers to benefit a non-appealing party in an *in rem* action. In *Elledge v. Welch,* 238 N.C. 61, 76 S.E. 2d 340 (1953) there was an action brought to sell land to make assets for a decedent's estate. One of the defendants who did not appeal was an adjudged incompetent widow. There was nothing *in the record* to indicate that her ostensible dower and homestead rights had been asserted by her guardian or investigated by the court. In remanding for ascertainment of whether those rights had been asserted and investigated we said that as an adjudged incompetent "her rights were committed to the care of the court . . . . In the exercise of our supervisory power we will assume jurisdiction on her behalf and treat errors committed against her as being before the Court and duly presented for review." *Id.* at 68, 76 S.E. at 345.

Another incident of the adversary mode is that only one with a "sufficient stake in an otherwise justiciable controversy" has "standing to sue." *Sierra Club v. Morton,* 405 U.S. 727, 731-732 (1972). Yet there are instances in our law where *any* person is given a right to proceed, e.g., in *qui tam* actions for a statutory penalty, N. C. Gen. Stat. 51-7, or in making application for the writ of habeas corpus, N. C. Gen. Stat. 17-5 ("Application . . . may be made . . . by any person in his behalf"). The reason for this departure from normal requirements of "standing" is that the "aggrieved party" is either too diffuse a class or is helpless to protect himself.

[3] Ordinarily the one who acts on behalf of an incompetent is his guardian, trustee, or guardian *ad litem* and the incompetent, being under a disability, is not accorded "standing." But where the complaint is that the guardian himself is acting either wickedly, incompetently or in ignorance of the facts, the

concept of "standing" must necessarily give way to the primary duty of the court itself as the ultimate guardian to protect the incompetent's interest. In the performance of this duty the court must receive, and should welcome, any pertinent information or assistance from any source. This principle was enunciated in *In re Propst, supra* at 568, 57 S.E. at 344:

> "While . . . [an incompetent] must be represented, in all judicial proceedings, by the guardian, it is entirely proper, either *in his own person or through any friend,* for him to call attention to any matter then pending and under the control of the Court, to the end that it may be investigated and his rights protected." (Emphasis supplied.)

Because of the failure to heed this principle the clerk and the judge below incorrectly focused their attention on the "standing" of Mr. Matthews; and the Court of Appeals, on the question of whether an appeal had properly been perfected by one with "standing" to do so.

[4, 5] It was error for the clerk to strike the allegations filed by Mr. Matthews. With regard to the purported appeal to the Court of Appeals Matthews asserted that he had tendered a proper case on appeal but that the clerk refused to file it. In this circumstance the proper action, if an appeal was required, was not dismissal, but rather issuance of the writ of certiorari to the end that the trial judge settle the case. *Lindsay v. Brawley,* 226 N.C. 468, 38 S.E. 2d 528 (1946); *Chozen Confections, Inc. v. Johnson,* 220 N.C. 432, 17 S.E. 2d 505 (1941).

[6] So far as the record shows scant attention was paid at the outset to the factual basis for the proposed sale presented in the general guardian's petition. The original order of the clerk was entered one day after the original petition was filed and simply repeated the allegations of the petition itself. In a similar case this Court remarked that a two day interlude between petition and order indicated a "degree of haste not consistent with that investigation and consideration usual and proper to be had in such proceedings." *In re Propst, supra.*

[9] If scant attention was paid to the initial factual issues in the petition, no attention whatever *so far as the record shows* was given to the facially valid objections to the sale thereafter raised. Mr. Matthews, whatever his motives, succeeded in raising serious questions regarding the sale which, according to

In re Lancaster

the record, were neither investigated nor answered by the clerk or the judge. They should have been and the record should so reflect.

On July 30, 1974, the guardian *ad litem* filed a "Request for Hearing" asking that the court "after proper notice to all parties hear evidence on the matters and things raised by the pleadings in this cause and enter such orders as will best protect the interest of the said Mary Augusta Lancaster." Pursuant to this request the clerk served notice on the general guardian with a copy to Mr. Matthews that he would "hold a hearing and receive evidence on all issues raised by the pleadings in this cause." At that point in the proceeding the major issues which had been raised were: (1) How will it materially promote the interest of the incompetent to sell 285 acres of land with an apparent fair market value of $158,000.00 when the land is unencumbered and producing income which when added to other income is within a few hundred dollars a year of meeting the incompetent's regularly recurring expenses? (We note that 31.3% of the incompetent's expenses were for administrative and legal fees. If this inordinately high sum could have been trimmed only slightly she would have had more than enough income to meet her expenses.) (2) Is the six thousand dollar debt a valid claim against the incompetent? If so, need it be paid forthwith? (3) Why sell land worth $158,000.00 when the sale of other smaller tracts or the negotiation of loans secured by the property may give the estate the liquidity it may need? (4) What is the federal and state income tax impact upon the proposed sale? Could this impact be lessened by a sale of a smaller tract or perhaps a sale where the purchase price is paid in installments?

At the hearing held on October 23, 1974, these issues *according to the record* were never addressed, investigated, or answered. It was the duty of the clerk to do so. It is conceivable that answers to all of these questions will demonstrate the advisability and even the necessity for this sale. It may be that the guardians, the clerk and the judge all have knowledge concerning these matters which impelled them to proceed with the sale. This knowledge, however, does not properly substitute for competent evidence and findings in the record. *Butler v. Weisler,* 23 N.C. App. 233, 208 S.E. 2d 905 (1974); *cf. McLean v. Breese,* 109 N.C. 564, 13 S.E. 910 (1891).

[7] Another difficulty in the case is the failure of the guardians and the clerk to state precisely the particular statute or statutes under which authority was found for this sale. There are four possible candidates (N. C. Gen. Stats. 33-31; 33-33; 35-10; 35-11) each with varying purposes and requirements. The proceeding before us should comply with one or more of these statutes.

General Statute 33-31 allows a guardian to apply for a sale of any part of his ward's estate by filing a verified petition showing that "the interest of the ward would be materially promoted by the sale . . . . " The truth of the petition must be "ascertained by satisfactory proof." The decree of sale must specify the "terms [of sale] as may be most advantageous to the interest of the ward."

[8] The "satisfactory proof" required under this statute must be some proof *in addition* to the guardian's petition and must show the necessity for the proposed sale. In *Harrison v. Bradley*, 40 N.C. 136, 144 (1847), Chief Justice Ruffin said:

> "The Court cannot forbear expressing a decided disapprobation of the loose and mischievous practice, adopted in this case, of decreeing the sale of an infant's land, upon *ex parte* affidavits offered to the Court, *without any reference to ascertain the necessity and propriety of the sale,* and the value of the property, so as to compare the price with it. The Court ought not act on mere opinions of the guardian or witnesses, but the material facts ought to be ascertained and put upon the record, either by the report of the master or the finding of an issue . . . . " (Emphasis supplied.)

In *In re Propst, supra,* the petition for sale was verified only two days before the order of sale. There were no affidavits by disinterested persons regarding the necessity of the sale. This Court said:

> "This is unusual. The statute [N. C. Gen. Stat. 33-31] contemplates that, in addition to the verified petition of the guardian, the Clerk shall require other satisfactory proof of the truth of the matter alleged. The Judge, exercising the functions of a Chancellor, where sales of this character were made pursuant to proceedings in courts of equity, always referred the petition to the Clerk and Master, who

took evidence and reported his conclusions to the Court. *It is usual,* since these large and important equitable functions are conferred upon the clerks, *to accompany the petition with affidavits showing the necessity for the sale.* The practice is to be commended and should not, without good cause, be departed from. *Id.,* 57 S.E. at 344. (Emphasis supplied.)

General Statute 33-33 provides for paying debts of or demands on wards. The guardian is authorized to petition the clerk for "an order to sell *so much of the personal or real estate* as may be sufficient to discharge such debt or demand . . . . " (Emphasis supplied.) The order of sale must "particularly specify what property is to be sold and the terms of the sale . . . . " Under this section the clerk must first ascertain that there is a debt due. Only that specified part of the land necessary to pay off the debt is to be ordered sold. *Spruill v. Davenport,* 48 N.C. 42 (1855) ; *Leary v. Fletcher,* 23 N.C. 259 (1840).

General Statute 35-10 authorizes a sale when upon report of the guardian to the clerk it appears that the "personal estate" of a "mental defective, inebriate or mentally disordered person . . . has been exhausted, or is insufficient for his support" *and* when such person "is likely to become chargeable on the county." The order of sale "shall specify particularly the property thus to be disposed of . . . and shall be entered at length on the records of the court . . . . "

General Statute 35-11 applies when "it appears to the clerk, upon the petition of the guardian of any mental defective, inebriate or mentally disordered person, that a sale or mortgage of any part of his real or personal estate is necessary for his maintenance, or for the discharge of debts unavoidably incurred for his maintenance . . . or when the clerk is satisfied that the interest of . . . [such] person would be materially and essentially promoted by the sale . . . . " As used in General Statutes 35-10 and 35-11 "mental disorder" is defined by General Statute 35-1.1.

Under all four statutes the procedure to be followed is that provided by General Statute 1-339.1 *et seq.* for judicial sales.

The proceeding before us has the flavor of all four statutes. In the general guardian's original petition he alleges the per-

sonal property of the incompetent has been exhausted, N. C. Gen. Stat. 35-10, the existence of a debt, N. C. Gen. Stats. 33-33; 35-11, and that sale will be to the "best interest of said ward and will subserve her estate." N. C. Gen. Stats. 33-31; 35-11. The clerk's order is entered on the basis of "said petition and other satisfactory proof." N. C. Gen. Stat. 33-31. The clerk also finds "after investigation of the facts and circumstances . . . that the interest of the said Mary Augusta Lancaster would be materially promoted by a sale of the said 285 acre tract . . . and would best subserve her estate and said sale would be most advantageous . . . . " N. C. Gen. Stat. 33-31; 35-11. He orders a sale for cash, the proceeds of which after payment of all liens and costs of sale to be held by the guardian "for the payment of the legal debts and for the maintenance and support of said ward." N. C. Gen. Stats. 33-31; 33-33; 35-11.

On remand it should be determined which statute or statutes authorize the proceedings. Before confirming the sale, both the clerk and the judge should be satisfied the statutory requirements have been followed and that the record so reflects. Defects, if any, which may be found to exist in the initial order of sale based on failure to observe applicable statutory requirements may be cured by further proceedings prior to confirmation.

[9] Because we, too, must assiduously protect the interest of the incompetent and because this sale may well materially promote her interest or be necessary to pay valid past, present and reasonably anticipated future claims against her, and may satisfy statutory requirements we do not set aside the order of sale. Rather we set aside the clerk's and the judge's confirmation of the sale.

Confirmation of a judicial sale is a matter within the discretion of the court. This Court said in *Harrell v. Blythe,* 140 N.C. 415, 416-17, 53 S.E. 232 (1906) :

"Where land is sold under a decree of court, the purchaser acquires no independent right. He is regarded as a mere preferred proposer until confirmation, which is the judicial sanction or the acceptance of the court, and until it is obtained, the bargain is not complete . . . . Sales of this character are only conditional and are not complete until they have been reported to, and confirmed by the court. The bidder cannot complain of this rule, for he

> makes his offer to buy with the understanding that the whole matter is entirely under the control of the court and that his bid may be rejected and the sale set aside if, in the exercise of its sound discretion, the court should think proper to do so . . . . Rorer, in his work on Judicial Sales, sections 122 and 124, says that while the court will have a proper regard to the interest of the parties and the stability of judicial sales, it has a broad discretion in the approval or disapproval of a sale made under its decree; and, in section 126, he further says that the court is clothed with an unlimited discretion to confirm a sale or not, as may seem wise and just. Confirmation is consent, and, the court being the vendor, it may consent or not in its discretion."

At the time of confirmation it should appear *from the record* to the confirming authority that the sale will materially promote the interest of the incompetent, or be necessary to pay valid claims against her or for her regular maintenance. If from the record this determination cannot reasonably be made, confirmation should be withheld. "[A]fter a sale it ought to appear in like manner to be for the benefit of the infant to confirm it, otherwise there is great danger of imposition on the Court and much injury to infants." *Harrison v. Bradley, supra.*

When the sale came on for confirmation before the clerk and the judge this record was replete with unanswered factual issues and legal questions which we already have noted. The clerk and judge should have resolved these issues and questions before they exercised their discretion in favor of confirmation, and the record should so reflect.

We, therefore, remand the case to the Franklin County Superior Court to this end: The clerk being scrupulous to observe applicable statutory requirements shall hear such competent evidence as may be offered by the general guardian, the guardian *ad litem,* and special counsel for the incompetent, who shall continue to act in this capacity, on the issues which have been so far raised, shall make findings based thereon, and shall recite the kind of proof he considered in making his findings. Based upon these findings the clerk shall then determine whether to confirm the sale. The matter shall then come again before either the resident judge or a judge of superior court holding the courts of the district in order that he may determine whether on the record then before him to confirm the sale.

Remanded.